**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **RODNEY HOJNOWSKI, JR.,** | : | |
| **Plaintiff,** | : | |
| v. | : | **CIVIL NO. 06-CV-1228** |
| | : | |
| **PRIMECARE MEDICAL, et al.,** | : | |
| **Defendants.** | : | |

_____ :

## MEMORANDUM OPINION & ORDER

**Rufe, J.**                                                                                    **June 27, 2008**

## I.  INTRODUCTION

Plaintiff Rodney Hojnowski, Jr. (hereinafter "Plaintiff" or "Hojnowski"), filed the

instant action for compensatory, declarative and punitive relief under 42 U.S.C. § 1983, alleging

that the defendants provided him with inadequate medical treatment in prison in violation of the

Fourteenth Amendment to the U.S. Constitution.  The events underlying this case occurred while

Plaintiff was held as a pre-trial detainee at the Berks County Prison in 2005.  At this juncture of

the litigation, the remaining defendants are PrimeCare Medical, Inc. (hereinafter, "PrimeCare"),

the private company that contracted with Berks County to provide medical services to inmates in

the Berks County Prison, and Grace Karrer (hereinafter, "Karrer"), a nurse employed by

Primecare at the Berks County Prison at all times relevant to the action.[1]  Presently before the

Court are the Motions for Summary Judgment of these two defendants.  For the reasons set forth

below, the motions will be deferred and further briefing by counsel required.

_____

[1] Two additional defendants named in the original Complaint and the subsequent Amended Complaint in this matter have been dismissed by stipulation of the parties and Order of the Court. [See Doc. Nos. 58 & 59].

1

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[2]  In this analysis, a fact is "material" if it could affect the outcome of the suit under the applicable substantive law, while an issue is "genuine" if the relevant evidence as to that issue could permit a jury reasonably to return a verdict for the nonmovant.[3]

The party seeking summary judgment has the initial burden to support its motion with evidence that could potentially be admissible at trial.[4]  If this initial requirement is satisfied, the burden shifts to the nonmovant to "set out specific facts showing a genuine issue for trial."[5]  The nonmovant may meet this burden by submitting proper evidence that either negates an essential element of the movant's claims, or by demonstrating that the movant's evidence cannot establish an essential element of its claims.[6]

In considering a summary judgment motion, the Court does not weigh the evidence or make credibility determinations.[7]  Moreover, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[8]

---

[2] Fed. R. Civ. P. 56(c) (2007).

[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[4] Callahan v. A.E.V., Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999).

[5] Fed. R. Civ. P. 56(e)(2).

[6] Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986).

[7] Anderson, 477 U.S. at 255.

[8] Id.

Of course, in order to assess whether the parties have adduced evidence related to essential elements of the relevant legal claims, a Court must first be assured that the parties and counsel, in their arguments addressed to the Court, are laboring under the proper legal standard.

### III.  FACTUAL BACKGROUND

The following is a recitation of both the disputed and undisputed record facts set forth in the light most favorable to the plaintiff, Hojnowski.  This recitation does not include, and the Court does not consider, allegations by Plaintiff which lack a proper basis in the record evidence.[9]

At all times relevant to this action, Plaintiff was detained for pretrial purposes at the Berks County Prison, in Berks County, Pennsylvania.[10]  Defendant PrimeCare Medical, Inc., is a professional corporation which, during the relevant time, had a contract to provide medical treatment to the inmates of Berks County Prison.[11]  In the same time period, Defendant Grace Karrer was employed by PrimeCare as a nurse at that prison.[12]

A detainee in the Berks County Prison in March of 2005 could seek medical attention for a health concern by several different means.[13]  Through the so-called "sick call" procedure, an inmate could complete a sick call slip, including a description of his medical

---

[9] See Celotex, 477 U.S. at 322-23.

[10] Am. Compl. ¶ 3.

[11] Id. ¶ 4.

[12] Id. ¶ 5.

[13] The general description of the procedures by which prisoners at the Berks County Prison could notify medical personnel of medical issues is not contested, and is set forth in the Brief in Support of the Motion for Summary Judgment of Defendant PrimeCare, and accompanying exhibits.  See Br. of Def. PrimeCare at 2 - 3 (citing Ex. S, Dep. Tr. of J. Kirsch at pp. 11-13; Ex. T, Dep. Tr. of P. Dillman at 12-13).

condition or symptoms, and place the slip in a box located on the cell block.  The slips would then be collected and triaged by a nurse once per day to determine which type of medical provider should see the inmates in question, if any.  Depending on the condition described, an inmate would be scheduled to see a nurse, a certified nurse practitioner, a physician's assistant, or a physician.  In contrast, in the case of an inmate suffering an apparent medical emergency, a corrections officer could contact the medical department directly on the inmate's behalf, seeking an immediate medical response.  Finally, an inmate could approach a nurse who happened to be on the cell block – for example, to dispense medication – with his medical concern.  Based upon the situation, the nurse could respond by treating the concern as a medical emergency requiring immediate response, or by recommending recourse to the standard sick call triage procedure.

At her deposition, Defendant Karrer stated that, when performing the standard nurse's function of dispensing medicine to inmates in their cells, she would not stop to "look at" a prisoner's medical problem that had been brought to her attention unless the problem was an emergency, such as a diabetic coma or heart attack.[14]  Instead, she would encourage the inmate to submit a sick call slip.[15]  Karrer further stated that this approach accorded with a PrimeCare policy directing that a nurse dispensing medication on a cell block should not stop doing so in order to assess an individual prisoner's medical concern except in the case of an apparent medical emergency.[16]

---

[14] Pl.'s Mem. Opp., Ex. E, Karrer Dep. 12:4-8, Nov. 16, 2007.

[15] Id.

[16] Id. at 12:12-15.

On March 5, 2005, a lump formed on Plaintiff's left thigh.[17]  Plaintiff completed a sick call request slip, dated March 5, 2005, stating thereon, "I have a lump on my upper left leg caused by an ingrown hair[;] I would like to have it checked please[.] Thank you."[18]  During the night of March 5, or in the early morning hours of March 6, 2005, the lump on Plaintiff's leg opened and began to drain.[19]  On March 6, 2005, at approximately 6:30 in the morning, Defendant Karrer was dispensing medication to inmates on Plaintiff's cell block when Plaintiff showed her the draining lump on his thigh.[20]  In response, Karrer asked Plaintiff if he had submitted a sick call slip about the issue.[21]  Plaintiff told her that he had.[22]  Defendant Karrer then told Plaintiff he would have to wait to be seen by a medical provider at sick call.[23]  There is no evidence that Nurse Karrer made a note on Plaintiff's prison medical records regarding Plaintiff's draining sore or otherwise notified prison medical providers of her interaction with Plaintiff on the morning of March 6.

Thereafter, Plaintiff did not submit a second sick call slip noting that the lump on his leg had opened and begun to drain,[24] and although he had contact with at least two other

---

[17] Am. Compl. ¶ 12.  Plaintiff signed and verified that the factual allegations contained in his Amended Complaint are correct and true.

[18] Pl.'s Mem. Opp., Ex. A.

[19] Plaintiff uses the terms "lump" and "boil" interchangeably to describe the protrusion that formed on his leg.  See id., Ex. B, Hojnowski Dep. 35:21-24, Sept. 28, 2007.

[20] Id. at 49:1-2.

[21] Id. at 49:3-4.

[22] Id. at 49:4.

[23] Id. at 49:5.

[24] Br. of Def. PrimeCare, Ex. R, Hojnowski Dep. 38:5-8, Sep. 28, 2007.

medical providers on March 6 and March 7, 2005, he did not notify these individuals of his changed condition.[25]  However, on March 6 and 7, Hojnowski wrapped the affected area of his left thigh with bunches of toilet paper.[26]

Pursuant to the call slip concerning an ingrown hair that he had submitted on March 5, Plaintiff was seen at the Berks County Prison sick call on March 8, 2005.[27]  He was seen by Physician Assistant Jesse Kirsch, who diagnosed the still open and draining lump on Plaintiff's left leg as an "infected cyst" measuring two-and-a-half to three-and-a-half inches across, and prescribed various treatments, including a ten-day regime of the medicine Bactrim, dressing the cyst with a bandage and Bacitracin, taking Motrin for pain, and cleaning with Dial soap.[28]  No statement as to the cause or specific nature of the infection appears in the treatment notes from Plaintiff's March 8, 2005 sick call visit.[29]

---

[25] Plaintiff's Medical Charting Record from the Berks County Prison shows that he received the medication Sinequan twice a day, once in the morning and once in the evening, during March of 2005, and in particular shows that on March 6 and March 7 Sinequan was dispensed to Hojnowski both at 6:00 a.m. and 7:00 p.m. by a PrimeCare nurse.  Br. of Def. PrimeCare, Ex. U.

[26] Am. Compl. ¶ 16.

[27] Id.

[28]  Pl.'s Mem. Opp., Ex. D at 0062 (Nursing Assessment for R. Hojnowski of 3/8/05).

[29] See id.  Although Plaintiff asserts in his Memorandum in Opposition to the Motions for Summary Judgment that the cyst was infected with Methicillin resistant Staphylococcus aureus ("MRSA") on March 8, 2005, no potentially admissible evidence on this point appears in the record.  Plaintiff has presented evidence, likely inadmissible under the rule against hearsay, that a receipt for payment he received on March 8, 2005, stated that he had a "Staph" infection, and that he "confronted" Kirsch about this upon reading the receipt.  See Am. Compl. ¶17.  The receipt does not appear in the record.  Plaintiff also stated in his deposition that he had heard rumors about current inmates infected with staph in the Berks County Prison in early March, 2005, and that "one kid had his whole ear blown up."  Br. of Def. PrimeCare, Ex. R, Hojnowski Dep. 52:18-53:10, Sep. 28, 2007.  Even if this evidence were admissible, the determination of which is premature at this time, it would not suffice to permit the Court to find that Plaintiff had the particular form of Staphylococcus infection known as MRSA on March 8, 2005.  This is because the record is devoid of medical evidence that the term "Staph," as used by Plaintiff or on the receipt to which he refers, was meant to describe an infection by the MRSA bacterium as opposed to some other form of staph infection.  The Court is unwilling to infer a medical diagnosis without supporting medical evidence or opinion, and no such evidence here appears.

At a follow-up appointment on March 11, 2005, Plaintiff was examined by Nurse Practitioner Paula Dillman, who noted the continued presence of an erythematous draining wound on his left thigh, but also noted that Plaintiff's cyst exhibited reduced drainage, size and redness.[30]  She prescribed further use of Bactrim, Bacitracin, bandaging and the other therapies prescribed on March 8.[31]  At a follow-up appointment on March 18, 2005, Nurse Practitioner Dillman found that Plaintiff's abscess had "no drainage," and deemed it "healed."[32]

On April 21, 2005, treatment records from a sick call visit at the prison state that Plaintiff presented with a "cyst/abscess," and note that Plaintiff "has had Staph infx. [sic] before."[33]  The Court understands the term "infx" to be a shorthand form of "infection," and infers that Plaintiff was diagnosed with a staph infection at this time.  The entry does not state when Plaintiff's prior staph infection occurred.  Plaintiff was prescribed a therapy of Bactrim, Dial soap, Motrin, and gauze dressings with Bacitracin at this visit.

Later treatment notes, from August 2005, show that Plaintiff asked medical providers at the Berks County Prison to test whether he was a MRSA carrier.[34]  They did so, and in September, 2005, it was confirmed that Plaintiff carried MRSA.[35]  Treatment records from that month by Doctor Drue Wagner state, "discussed options (do nothing vs. treat with intranasal

---

[30] Pl.'s Mem. Opp., Ex. D at 0060 (Dispensary Card for R. Hojnowski, entry dated 3/11/08).

[31] Id.

[32] Id. at entry dated 3/18/05.

[33] Id. at 0058 (Dispensary Card for R. Hojnowski, entry dated 4/21/05).

[34] Pl.'s Mem. Opp., Ex. D at 0057 (Dispensary Card for R. Hojnowski, entries dated 8/18/05 and 8/22/05).

[35] Id. at 0054 (Dispensary Card for R. Hojnowski, entry dated 9/7/05).

Bactroban)," and also note that Plaintiff "has had only one skin infection."[36]  The notes conclude, "after review of MRSA protocol, Pt. not a candidate for Bactroban – Pt. has not had 3 infections in 6 mo. – will not prescribe Bactroban @ this time."[37]  The "MRSA Protocol" to which Dr. Wagner referred was a PrimeCare policy that decolonization treatment would be available only to inmates who had three staph episodes in a six-month period.[38]  No further medical records appear.  Plaintiff avers that his various infections caused sensations of pain, itching and burning, and left him with a permanent, dime-sized scar on his left thigh.[39]

Defendants have submitted the report of Joseph E. Paris, Ph.D, MD, a consultant in correctional healthcare ("Paris").[40]  Therein, Paris reviews the medical documentation from Plaintiff's treatment at the Berks County Prison in 2005 and 2006 and reaches certain conclusions, including the bottom line opinion, to a reasonable degree of medical certainty, "that [Plaintiff] had unimpeded access to care and the care provided for his episode of MRSA at the Berks County Prison met contemporary standards."[41]

### IV. PROCEDURAL HISTORY

Acting *pro se* and proceeding *in forma pauperis*, Plaintiff filed the original Complaint in this action on March 22, 2006, alleging that then-named defendants PrimeCare Medical, Grace Karrer, Jesse Kirsch and Paula Dillman had deprived him of federal rights under

---

[36] Id. at entry dated 9/12/05.

[37] Id. at entry dated 9/18/05.

[38] See id.; see also Am. Compl. ¶ 27.

[39] Pl.'s Mem. Opp., Ex. B, Hojnowski Dep. 40:1-18, 82:8-10, Sep. 28, 2007.

[40] Def. PrimeCare's Reply Ex. V.

[41] Id.

color of state law, in violation of 28 U.S.C. § 1983.[42]  Plaintiff claimed that prison medical

providers Karrer, Kirsch and Dillman, and their employer PrimeCare, had violated his rights

under the Due Process Clause of the Fourteenth Amendment by acting with deliberate

indifference to his serious medical condition while he was being held as a pre-trail detainee at the

Berks County Prison.  Shortly thereafter, Plaintiff filed a Motion to Appoint Counsel.[43]

       Defendants Karrer and Dillman filed a Motion to Dismiss the Complaint on April

25, 2006,[44] and Motions to Dismiss from the other defendants soon followed.[45]  On June 30,

2006, after Plaintiff filed responses in opposition to the Motions to Dismiss, the Court granted

the Motions without prejudice, dismissing the original Complaint as to each defendant but

allowing Plaintiff a limited period of time in which to file an amended complaint.[46]  The basis for

the non-prejudicial dismissal was the Court's view that the *pro se* filings, taken together,

suggested that Plaintiff might be able to make out a cognizable claim of deliberate indifference to

serious medical need driven by PrimeCare policies if permitted to amend his pleadings.[47]

       Plaintiff filed an Amended Complaint on July 24, 2006, again naming Karrer,

Kirsch, Dillman and PrimeCare as Defendants.[48]  The defendants filed Motions to Dismiss the

---

[42] Doc. No. 1.

[43] Doc. No. 6.

[44] Doc. No. 7.

[45] Doc. No. 12 (Mot. Dism. of Def. PrimeCare); Doc. No. 17 (Mot. to Dism. of Def. Kirsch).

[46] Doc. No. 21.

[47] See id.

[48] Doc. No. 26.

Amended Complaint, each of which was met with a Response from Plaintiff, still acting *pro se*.[49] By Order of January 30, 2007, the Court denied the Motions, ruling that Plaintiff had adequately alleged that the defendants had denied him prompt medical care arbitrarily or for non-medical reasons, but expressly withheld any comment on the likely success of Plaintiff's claims on the merits.[50]  Each defendant then filed an Answer to the Amended Complaint.[51]

On February 2, 2007, the Court referred the matter to the Prisoner Civil Rights Panel of this District, seeking a volunteer attorney to represent Plaintiff *pro bono*,[52] and soon thereafter placed the action in suspense pending such appointment.[53]  In May of 2007, Plaintiff was appointed counsel from a large Philadelphia law firm, and the action was removed from the suspense docket on May 17, 2007.[54]

During the pendency of the Motions to Dismiss the Amended Complaint, Plaintiff filed a Petition for a Court Appointed Expert.[55]  All motions to dismiss having been denied and the issue joined, on May 31, 2007, the Court ordered Defendants to show cause why a medical expert should not be appointed on Plaintiff's behalf, pursuant to Federal Rule of Evidence 706(a).[56]  Defendant PrimeCare filed a Response stating its opposition to such appointment, and

---

[49] Doc. Nos. 27, 30, 32, 34, 39, 42.

[50] Doc. No. 44.

[51] Doc. Nos. 46, 47, 52.

[52] Doc. No. 45.

[53] Doc. No. 49.

[54] See Doc. Nos. 50 & 51.

[55] Doc. No. 40.

[56] Doc. No. 53.

Plaintiff's newly appointed counsel requested that the Court defer its ruling on the question so that counsel could further familiarize itself with the case before filing a reply.  Plaintiff subsequently moved for a second order to show cause why a medical expert should not be appointed,[57] and the Court issued such Order on October 16, 2007, including a requirement that each party provide argument as to the appropriate manner and source of compensation of any expert appointed under Federal Rule of Evidence 706.[58]  Responses and a Reply were filed.[59] After a telephone conference with counsel on the Motion in which Plaintiff's counsel maintained that Defendants should be required to pay for Plaintiff's requested expert and Defendants' counsel argued in opposition, noting other available funding sources, including the Public Interest Litigation Fund that is ancillary to the Prisoner Civil Rights Panel or Plaintiffs' counsel's law firm,[60] the Court dismissed the rule to show cause without prejudice on December 12, 2007.[61]  The deadline to complete expert discovery was extended to January 31, 2008, through the same Order, allowing Plaintiff to consider its options as to a medical expert.  Plaintiff did not subsequently file a new motion requesting appointment of an expert.

---

[57] Doc. No. 61.

[58] Doc. No. 62.

[59] Doc. Nos. 63, 64, 65.

[60] Attorneys – such as Plaintiff's counsel here – who are appointed through the Prisoner Civil Rights Panel of the United States District Court for the Eastern District of Pennsylvania to represent *in forma pauperis* plaintiffs may apply to receive reimbursement up to $2,500.00 for reasonable expert services obtained in furtherance of litigation through the Public Interest Litigation Fund ("the Fund").  The Fund is an independent corporation established for the support and benefit of attorneys who represent indigent litigants by appointment in this Judicial District.  The Fund Guidelines, including all necessary information regarding reimbursement, are sent to the contact person for any firm accepting appointment through the Prisoner Civil Rights Panel at the time of appointment.  The Court notes that the Fund Guidelines state, "[b]ecause the Fund's resources are limited . . . counsel are requested to economize and to absorb as much expense as financially practicable."  Public Interest Civil Litigation Fund Guidelines ¶ 7.

[61] Doc. No. 67.

Defendants PrimeCare and Karrer remained in the action after the Court dismissed Defendants Kirsch and Dillman upon stipulation of all parties on August 29, 2007.[62] Defendant Karrer filed a Motion for Summary Judgment on February 21, 2008, asserting that Plaintiff could not adequately support his claims against her because he had not obtained an expert medical report stating that the two-day delay in treating Plaintiff's cyst in early March, 2005, constituted improper medical treatment, let alone deliberate indifference to a serious medical need.[63]  Defendant PrimeCare also moved for summary judgment, similarly arguing that Plaintiff's attack on its policies and procedures must fail because PrimeCare had obtained unrebutted medical expert testimony that its policies and procedures met contemporary standards for the provision of correctional medical care at all times relevant to the litigation.[64]

Plaintiff's counseled Response contends that Defendant Karrer was deliberately indifferent to Plaintiff's serious medical need when she failed to arrange for immediate treatment of his draining cyst on March 6, and contends that PrimeCare's failure to put policies and procedures in place related to the identification and treatment of MRSA staph infections, or to require adherence to a general infection control policy, during the relevant time periods inevitably caused deliberate indifference to Plaintiff's serious condition.[65]  Defendant PrimeCare filed a Reply, and Plaintiff filed a Sur-reply.  The Motions and all related filings treat the Plaintiff's claim as if it were governed by the Eighth Amendment to the United States

---

[62] Doc. Nos. 58 & 59.

[63] Mot. Summ. J. of Def. Karrer ¶ 14.

[64] Mot. Summ. J. of Def. PrimeCare ¶¶ 24-26.

[65] See Pl.'s Mem. Opp. at 3.

Constitution.  After careful consideration of all relevant filings and the record evidence, the

Court finds that Defendants' Motions for Summary Judgment must be deferred to allow for

supplemental briefing from the parties.

## V.  DISCUSSION

   Plaintiff has brought claims against both defendants under 42 U.S.C. § 1983.

For his section 1983 claims to survive, Plaintiff must demonstrate that a person acting under

color of state law deprived him of a right protected under the Constitution or laws of the United

States.[66]  It is undisputed that PrimeCare and its employee Karrer were acting under color of

state law when engaged in providing medical care in the Berks County Prison.  Thus the Court

turns to the task of identifying "the exact contours of the underlying right said to have been

violated" so as to ascertain whether any such violation occurred.[67]

   As the basis for his section 1983 claim, Plaintiff alleges violations of his due

process rights under the Fourteenth Amendment through deliberate indifference to his serious

medical needs while he was a pretrial detainee.  This claim, like the arguments of counsel in this

matter, somewhat misapprehends the standard of medical treatment the Constitution requires for

pretrial detainees.[68]  "The constitutional standard governing conditions of confinement for

---

[66] Natale v. Camden County Corr. Facility, 318 F.3d 575, 580-81 (3d Cir. 2003).

[67] County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

[68] The standard of "deliberate indifference to serious medical need," articulated by the Supreme Court in Estelle v. Gamble, 429 U.S. 97 (1976), applies to claims of convicted and incarcerated prisoners, which are governed by the Eighth Amendment.  The Third Circuit has emphasized that while the Estelle analysis can inform the Fourteenth Amendment analysis applicable to pretrial detainees, the Eighth and Fourteenth Amendment standards are not coextensive.  See Hubbard v. Taylor, 399 F.3d 150, 165-66 (2005) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)); Montgomery v. Ray, 145 Fed. App'x 738, 740 (3d Cir. 2005) (vacating and remanding district court ruling premised on Estelle analysis in case involving pretrial detainee's claims of inadequate medical care in prison for consideration under the Fourteenth Amendment standard).

detainees is whether the conditions amount to 'punishment' without due process of the law, in violation of the Fourteenth Amendment."[69]  In this context, the Supreme Court has stated that there is "a distinction between punitive measures that may not be constitutionally imposed prior to an adjudication of guilt and regulatory restraints that may."[70]

In Hubbard v. Taylor, the Third Circuit, citing extensively to the Supreme Court's decision in Bell v. Wolfish, explained that the analysis of whether detainee treatment amounts to punishment proceeds in two steps.[71]  A "court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination will generally turn on whether [the treatment] has an alternative purpose . . . and whether it appears excessive in relation to that purpose."[72]  The second step of this test asks whether the treatment at issue is "rationally related" to a legitimate purpose, an assessment informed by inquiring whether the treatment causes detainees "to endure such genuine privations and hardship over an extended period of time, that the conditions become excessive in relation to the purposes assigned to them."[73]  In performing this assessment, a district court considers the totality of the circumstances in the prison,[74] and must recognize that

---

[69] Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 n.31 (3d Cir. 1987) (citing Bell, 441 U.S. at 535).

[70] Bell, 441 U.S. at 537.

[71] Hubbard, 399 F.3d at 158-160 (citing Bell, 441 U.S. at 538-540).

[72] Bell, 441 U.S. at 538-39.

[73] Union County Jail Inmates v. DiBuono, 713 F.2d 984, 992 (3d Cir. 1983) (citing Bell, 441 U.S. at 542).

[74] Hubbard, 399 F.3d at 160.

"the effective management of the detention facility . . . is a valid objective," involving considerations that are "peculiarly within the province and professional expertise of corrections officials."[75]  As such, the Supreme Court has "warn[ed]" that unless substantial record evidence demonstrates that prison officials have met the unique demands of prison management with an excessive or "exaggerated" response, "courts should ordinarily defer to their expert judgment in such matters."[76]

Of some relevance to this matter, the Third Circuit has held that ordinarily in cases involving detainee claims of deficient medical care, "[w]here the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support [a constitutional] claim."[77]  An exception to the foregoing rule applies in situations where the care provided is "callous, grossly negligent, shocking to the conscience, unconscionable, intolerable to . . . fundamental fairness or barbarous."[78]

The protection against "punishment" afforded pretrial detainees under the Fourteenth Amendment has a plainly different basis than the standard governing convicted inmates' claims related to conditions of confinement, which derives from the Eighth Amendment's prohibition against cruel and unusual punishment.[79]  Nonetheless, the Third Circuit has made clear that "even though the constitutional protections afforded prisoners and

---

[75] Bell, 441 U.S. at 540, 540 n.23.

[76] Id. at 540 n. 23.

[77] Norris v. Frame, 585 F.2d 1183, 1186 (3d Cir. 1978).

[78] Id.

[79] See id.; see also Natale, 318 F.3d at 581-82 (noting different textual basis for rights of detainees and convicted prisoners to be free from inadequate medical care).

pretrial detainees against inadequate medical care arise from different textual sources, the standards governing the provision of medical care to each class are similar."[80]

In Estelle v. Gamble,[81] the Supreme Court set forth the standard for prisoner claims of inadequate medical care under the Eighth Amendment, and that standard, in turn, has been deemed by the Third Circuit to establish "a floor" for the medical treatment rights of pretrial detainees under the Due Process Clause of the Fourteenth Amendment.[82]  Thus, insofar as it illuminates the baseline of required protections, the Third Circuit has found it proper to "evaluate [a] Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment."[83]

In Estelle, the Supreme Court held that the Eighth Amendment prohibits prison authorities from acting with "deliberate indifference to the serious medical needs of prisoners."[84]  Under the two-pronged test developed by the Third Circuit, this standard is satisfied by a prisoner's showing that his medical needs were serious and that prison officials exhibited deliberate indifference to such needs.[85]

A medical need is "serious" for purposes of this test if it has been "diagnosed by a physician as requiring treatment or . . . is so obvious that a lay person would easily recognize the

---

[80] Hubbard, 399 F.3d at 166 n. 22.

[81] 429 U.S. 97 (1976).

[82] Hubbard, 399 F.3d at 165-66 (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) ("the due process rights of a [pre-trial detainee] are *at least* as great as the Eighth Amendment protections available to a convicted prisoner")).

[83] Natale, 318 F.3d at 581-82.

[84] Estelle, 429 U.S. at 104.

[85] Lanzaro, 834 F.2d at 346.

necessity for a doctor's attention."[86]   The test for deliberate indifference, in contrast, may be met in any of several ways.

The Court first recognizes what does *not* constitute deliberate indifference.  Mere negligence or inadvertence in failing to provide adequate medical care, such as might support a malpractice claim, does not satisfy the standard, "nor does mere disagreement as to the proper medical treatment" called for in the inmate's circumstance.[87]   Indeed, as in the Fourteenth Amendment context, the Third Circuit has expressly held that in claims arising under <u>Estelle</u>, ordinarily, "[w]here the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support [a constitutional] claim."[88]

Again, medical treatment of this nature may satisfy the deliberate indifference standard only where the care provided is "callous, grossly negligent, shocking to the conscience, unconscionable, intolerable to . . .  fundamental fairness or barbarous."[89]   Moreover, delay of "necessary medical treatment . . . for non-medical reasons" may also constitute deliberate indifference.[90]

In <u>Natale v. Camden County Correctional Facility</u>, the Third Circuit reversed a

---

[86] <u>Id.</u> at 347.  The Court finds that there is, at a minimum, a genuine fact issue as to whether Plaintiff's medical condition on March 6, 2005, rose to the level of "serious medical need" under <u>Estelle</u>.  A lay person may well recognize that a doctor's care would be appropriate for an open, draining cyst on an individual's leg.  Accordingly, the focus of the <u>Estelle</u> analysis relative to the instant motions, if necessary, will concern whether there exists a genuine issue of material fact as to the second, "deliberate indifference" prong of the <u>Estelle</u> test.

[87] <u>See id.</u> at 346; <u>see also</u> <u>Hussman v. Knauer</u>, No. 04-2776, 2005 WL 435231, at *3 (E.D. Pa. Feb. 23, 2005).

[88] <u>Norris</u>, 585 F.2d at 1186.

[89] <u>Id.</u>

[90] <u>Lanzaro</u>, 834 F.2d at 346.

district court's grant of summary judgment for the defendant on a pretrial detainee's section 1983 claim against a prison healthcare provider ("PHS"), holding that fact questions existed as to whether the provider's employees were deliberately indifferent to the plaintiff's acute insulin dependency, and as to whether the provider's failure to erect a policy to promptly deliver medication to detainees created obvious medical risks amounting to deliberate indifference.[91] The Court noted that the parties' failure to argue the matter under the proper Fourteenth Amendment standard (they argued under Estelle) was not "fatal" to its review, since conduct constituting deliberate indifference to serious medical need for purposes of Estelle would likewise violate the protections afforded pretrial detainees under the Fourteenth Amendment.[92]

Of particular relevance to the instant case, the Natale court found fact questions of deliberate indifference based on delay where there was "specific evidence that . . . PHS employees delayed medical treatment for non-medical reasons – the PHS policy that failed to address the immediate medication needs of inmates with serious medical conditions."[93] Moreover, with respect to the corporate defendant, the court held, "a reasonable jury could conclude that the failure to establish a policy to address the immediate medical needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs."[94]  Thus, deliberate indifference satisfying the Estelle standard may appear in actual treatment administered or in the policies in

---

[91] 318 F.3d at 582-585.

[92] Id. at 581-82.

[93] Id. at 583.

[94] Id. at 585.

18

place governing modes of medical treatment in a prison.

In ruling on the instant Motions, then, the Court must determine if genuine issues of material fact exist as to whether the medical care received by Plaintiff amounts to "punishment" in violation of the Due Process Clause of the Fourteenth Amendment, a determination that may be informed, but not controlled, by the Eighth Amendment analysis articulated in Estelle.

The Court begins by attempting to identify Plaintiff's specific claims against the Defendants, respectively, so that the viability of the claims may be assessed.  Plaintiff claims that Defendant Karrer violated his medical treatment rights by requiring him to employ the prison's sick call procedure rather than treating him immediately or ensuring that he was treated immediately by another medical provider, after he made her aware of his open, draining cyst on March 6, 2005.  He was seen through the sick call procedure on March 8, 2005, and during this delay, he avers, he acquired a staph infection.  With respect to Defendant PrimeCare, Plaintiff claims that PrimeCare's policies and procedures resulted in a violation of his medical treatment rights, in particular identifying its policy of channeling prisoner medical complaints through the sick call procedure as implemented by Karrer, and its policy of administering certain "ointment, tests and/or extensive treatment" only after an inmate has had three episodes of staph in a six-month period.  In his Response to the instant Motions, Plaintiff also apparently attempts to raise an additional issue as to the general inadequacy of the PrimeCare policies that were in place prior to June of 2005, both in substance and as actually implemented.

Without the benefit of briefing from the parties detailing the application of the proper legal standard to the facts in this case, the Court could not properly reach conclusions as

to summary judgment on the claims and issues described above.  Rather, it is now for the parties to submit briefs reflecting the correct legal standard for the instant claims, as described by the Third Circuit in Hubbard and subsequent cases, and applying it to the record.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|                                         |   |                           |
|-----------------------------------------|---|---------------------------|
| **RODNEY HOJNOWSKI, JR.,**               | : |                           |
| **Plaintiff,**                           | : |                           |
| v.                                       | : | **CIVIL NO. 06-CV-1228**  |
|                                          | : |                           |
| **PRIMECARE MEDICAL,  et al.,**          | : |                           |
| **Defendants.**                          | : |                           |

_____:

## ORDER

      **AND NOW**, this 27th day of June 2008, upon consideration of Defendants'
Motions for Summary Judgment [Doc. Nos. 70 & 72], Plaintiff's Response [Doc. No. 73],
Defendant PrimeCare Medical's Reply [Doc. 74], Plaintiff's Sur-reply [Doc. No. 75], and all
pretrial filings of the parties, including pretrial memoranda, Motions in Limine and supporting
memoranda, proposed voir dire, proposed jury instructions, proposed verdict sheets, and all
responses and objections thereto [Doc. Nos. 76 - 111], it is hereby **ORDERED** as follows:

      1.  Counsel for the parties shall **FILE** supplemental briefs and accompanying
memoranda of law and exhibits (as necessary) in accordance with the attached Memorandum
Opinion, specifically addressing the application of the Third Circuit's ruling in Hubbard v.
Taylor  to this action.  The Court will defer ruling on the Motions for Summary Judgment until it
has considered the briefs of the parties.  Plaintiff's supplemental brief and memorandum shall be
filed of record within **twenty-one (21) days** of the date of this Order.  Defendants' briefs and
memoranda in response shall be filed of record within **twenty-one days** of the date of Plaintiff's
filing.  The briefs and memoranda may be no longer than twenty-five pages in combined total
length;

2.  All pretrial filings of the parties [Doc. Nos. 76 - 111] are **DISMISSED** without prejudice, to be renewed as appropriate at a later date;

3.  This matter is hereby **STRICKEN** from the July 8, 2008, Trial Pool;

4.  The conference scheduled to be held on Monday, June 30, 2008, at 3:00 P.M. is **not** cancelled by this Order, and shall still occur as scheduled.

It is so **ORDERED**.

**BY THE COURT:**

/s/ Cynthia M. Rufe

_____

**CYNTHIA M. RUFE, J.**

22