IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **RODNEY HOJNOWSKI, JR.,** | : | |
| Plaintiff, | : | |
| v. | : | CIVIL NO. 06-CV-1228 |
| | : | |
| **PRIMECARE MEDICAL, et al.,** | : | |
| Defendants. | : | |

**MEMORANDUM & ORDER**

Rufe, J.                                                                                                               April 30, 2009

**I.  INTRODUCTION**

    In this civil rights action, Plaintiff Rodney Hojnowski ("Hojnowski") claims he was denied adequate medical treatment as a pretrial detainee in the Berks County Prison in Berks County, Pennsylvania.  In prior stages of the case, numerous defendants were dismissed, leaving only two: Nurse Grace Karrer ("Karrer"), who interacted with Hojnowski at certain relevant times, and PrimeCare Medical, Inc. ("PrimeCare"), the corporation that provided medical and health services in the Berks County Prison during Hojnowski's incarceration (collectively, "Defendants").  After the Defendants moved for summary judgment on all claims and the parties submitted numerous related filings, the Court ordered further briefing on the legal standard applicable to claims of unconstitutional medical treatment made by pretrial detainees, as opposed to convicted prisoners.  The parties have submitted supplemental briefs on the issue, distilling their arguments and focusing on the appropriate legal standard.  Defendants' Motions for Summary Judgment are now ready for disposition.

1

## II.  BACKGROUND

Hojnowski's claims pertain to the medical treatment he received during an approximately forty-eight hour period of time in March 2005, and to the policies and procedures that governed the medical care he received.  A detailed review of the factual and procedural background of this case is set forth in this Court's Memorandum Opinion of June 27, 2008, and is hereby incorporated into this Memorandum.[1]  The Court only briefly recapitulates the facts here, taking the evidence in the light most favorable to Plaintiff.

Hojnowski was incarcerated as a pretrial detainee in the Berks County Prison ("Prison") in March, 2005.  At that time, Defendant PrimeCare provided medical and health services within the Prison.  Defendant Karrer worked in the Prison for PrimeCare, as a nurse.

### *A.  PrimeCare Policies and Procedures*

It is undisputed that, under PrimeCare policies and procedures in place at the Prison at the relevant time, a detainee such as Plaintiff could engage the "sick call" process to seek medical attention by submitting a sick call slip describing his condition to Prison medical staff via a drop box.  A Prison nurse would then triage the request slip and arrange for the appropriate medical response.  If an inmate presented his personal medical concern directly to a nurse who happened to be in the cell block, the nurse would determine on-the-spot whether the concern constituted an emergency requiring immediate treatment, was not emergent but still sufficiently serious as to justify placing the inmate directly into a medical "provider line" to be seen shortly, or instead was a matter appropriately channeled through the sick call triage process.

PrimeCare had an infection control policy in place at the Prison in March of 2005

---

[1] Mem. Op. and Order of June 27, 2008, at 3-13 [Doc. No. 113].

("Infection Control Policy" or "ICP").[2] The Infection Control Policy does not include a listing or description specifying the infectious diseases or types of infection to which it applies.[3] Nor does the ICP prescribe generally applicable procedures for the diagnosis or treatment of infections or infectious diseases in the Prison population, although it does specify basic diagnostic and treatment protocols for cases of Tuberculosis, Hepatitis and HIV,[4] and require staff to report certain communicable diseases or circumstances of infectious spread to public health officials.[5] Instead, the ICP directs medical staff to establish and maintain an appropriate program for infection control in the Prison that includes "[w]ritten policies, procedure and practice that define surveillance procedures to detect inmate/patients with infectious and communicable disease."[6]

In March of 2005, in accordance with the latter directive, PrimeCare medical staff

---

[2] Pl.'s Resp. Ex. J, Berks County Prison Infection Control Policy, effective date January 1, 2003 ("Infection Control Policy" or "ICP") [Doc. No. 73].

[3] Any indication as to scope or applicability that the ICP does contain is indeterminate. In sections describing the ICP's purpose, scope and general policy aims, references appear to "infections" and "infectious and communicable diseases" without limitation or qualification. See, e.g., id. at 1 ("[t]he purpose of this policy is to maintain a system for the prevention and control of infections within the Berks County Prison;" "PrimeCare Medical . . . policy requires that [sic] an infection control program, which includes, but is not limited to, concurrent surveillance of inmate/patients and staff, prevention techniques, treatment, and reporting of infections."). Thus the ICP could be interpreted as applying equally to all types of infection, no matter how benign. In other provisions, however, the Infection Control Policy reflects an approach focused on relatively more serious infections or diseases, such as "tuberculosis, sexually transmitted diseases, hepatitis virus, HIV and mass digestive infections." Id. at 1. For example, the ICP identifies only certain infectious diseases or circumstances of infectious spread as "reportable," that is, triggering mandatory reporting to public health officials when encountered in the Prison. Id. at 2. The "reportable illnesses" listed are: "hepatitis, meningococcal meningitis, measles, rubella, sexually transmitted disease, HIV and tuberculosis," while the reportable types of "multiple spread," or instances of infection spreading rapidly through the Prison population, listed are "staph infection and diarrhea." Id.

[4] See, e.g., id. at 3-5 (describing "isolation procedures appropriate for specific infections or communicable diseases," including Tuberculosis and Hepatitis "A" and "B").

[5] Id. at 1-2. As noted above, the "reportable illnesses" are, "hepatitis, meningococcal meningitis, measles, rubella, sexually transmitted disease, HIV and tuberculosis," while the reportable types of "multiple spread," or instances of infection spreading rapidly through the Prison population, listed are "staph infection and diarrhea."

[6] Id. at 2.

maintained certain policies and practices regarding the identification of infections in the Prison. These diagnostic policies and practices made no special provision for the identification of either individual boils or red lumps on the skin or Methicillin resistant Staphylococcus aureus infections ("MRSA"),[7] which can manifest as red swollen areas on the skin.[8] At that time, Prison medical staff received no particularized training on diagnosing various types of skin infection, including staph infection and MRSA, and instances of such infections were not tracked or automatically reported to public health officials.[9] Prior to June, 2005, if an inmate presented with symptoms of skin infection, including MRSA, to a Prison medical staff member, "it was up to the provider's clinical judgment . . . of what their treatment choices and their treatment approach or treatment plan would have been."[10]

In June of 2005, PrimeCare instituted a differential diagnosis policy for the identification, tracking and treatment of MRSA infections in the Prison population, including the screening of all skin infections with symptoms consistent with MRSA.[11] PrimeCare's corporate designee under Federal Rule of Civil Procedure 30(b)(6), Todd Haskins, stated that in the Prison, "prior to PrimeCare developing the MRSA Policy, there was [sic] certainly normal types of . . .

---

[7] Pl.'s Mem. Opp'n. Ex. E, Transcript of Deposition of Grace Karrer of November 16, 2007 at 18:10-19:3 ("Karrer Dep. Tr.") [Doc. No. 73]. In contrast, it appears that the PrimeCare policies and practices then in place did account for communicable skin diseases such as chicken pox. See id.

[8] Pl.'s Mem. Opp'n Ex. I, Transcript of Deposition of Todd Haskins of November 16, 2007 at 3:21-25 ("Haskins Dep. Tr.").

[9] Haskins Dep. Tr. at 31:8-15; Karrer Dep. Tr. at 21:4.

[10] Haskins Dep. Tr. at 36:21-24.

[11] Id. at 19:3-5, 34:12-18.

folliculitis, skin infections, et cetera . . . but MRSA was not a community issue at that time."[12] According to Haskins, PrimeCare instituted the MRSA Policy in the Prison after recognizing that MRSA was an "increasing problem."[13]  In "early 2005," Defendant Karrer and another nurse working in the Prison noticed more skin infections, including staph infections, and more "open" boils than usual in the inmate population.[14]

*B.  Hojnowski's Medical Treatment in March, 2005*

Hojnowski noticed a lump on the upper part of his left thigh on March 5, 2005, and submitted a sick call slip.  The lump was not open or draining on that date.  The slip, dated March 5, 2005, reported that Plaintiff had a "lump" on his thigh "caused by an ingrown hair," and stated a request that the lump be checked.[15]

Hojnowski avers that on March 6, 2005, at approximately 6:30 a.m., he stopped Defendant Karrer while she was dispensing medication on his cell block and showed her the lump on his thigh.  It had opened and begun to drain.  When asked by Karrer, Plaintiff told her that he had already submitted a sick call slip about the issue.  Karrer told him that his concern would be subject to the sick call process.  No note by Karrer reporting the interaction appears in Hojnowski's medical records. Karrer does not recall the interaction.

Hojnowski further states that in the subsequent forty-eight hour period, spanning

---

[12] Id. at 32:18-21.

[13] Id. at 35:7.

[14] Karrer Dep. Tr. at 23:5-7; Pl.'s Mem. Opp'n Ex. F, Transcript of Deposition of Jesse Kirsch of November 16, 2007 at 22:10-24:7 ("Kirsch Dep. Tr.").  No evidence has been adduced that might shed light on how many of these infections in "early 2005" resulted from, or were tested for, MRSA.

[15] Pl.'s Mem. Opp'n Ex. A.

5

March 6 and 7, 2005, he placed toilet paper over the lump on his upper thigh, which continued to drain.  On the evening of March 6, 2005, and twice on March 7, 2005, PrimeCare nurses dispensed medication to Hojnowski, but Hojnowski did not report the lump to these individuals.  Nor did Hojnowski submit a second sick call slip to report that the condition of his lump had changed, in that it had started to drain.  Based on the March 5 sick call slip requesting to be seen for an ingrown hair, Hojnowski was treated on March 8, 2005 at the Prison sick call.  He was diagnosed with an "infected cyst" stemming from an ingrown hair,[16] and prescribed various treatments which are not at issue.  Treatment notes related to the infection from March 8, 2005 do not indicate the cause of the infection.  In particular, no mention of staph infection or MRSA appears on the treatment notes from this episode.

      Hojnowski's medical records show that in the months following the March, 2005 treatment episode just described, he interacted with Prison medical staff numerous times for different reasons.  In August, 2005, Plaintiff was diagnosed by Prison medical staff as a carrier of MRSA.  However, no competent evidence has been presented from which the Court could reasonably infer that the infected cyst Hojnowski experienced in early March, 2005 resulted from MRSA.  Hojnowski has presented no expert medical evidence to that point, or to any other.

      In contrast, Defendants present the expert medical report of Joseph E. Paris, Ph.D, MD, a correctional healthcare consultant ("Dr. Paris").  Dr. Paris does not make a particularized finding as to Hojnowski's treatment in March of 2005.  But he concludes, after reviewing Hojnowski's Prison medical records and the applicable PrimeCare policies, that while at the

---

[16] Pl.'s Mem. Opp'n Ex. D at *10, PrimeCare Medical Form "Nursing Assessment For Skin Lesions/Rashes" for Rodney Hojnowski of March 8, 2005 ("March 8, 2005 Assessment").

Prison in 2005 and 2006 Hojnowski had unimpeded access to medical care and that the medical care he received met contemporary standards.[17] This opinion encompasses the March, 2005 treatment episode presently at issue.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[18]  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[19]  Where the burden of persuasion at trial rests with the nonmoving party, the movant meets the summary judgment standard by showing that the nonmoving party's admissible evidence is incapable of carrying its burden.[20]  In considering a motion for summary judgment, a court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party.  A court does not, however, make credibility determinations or weigh the evidence presented.[21]

### IV.  DISCUSSION

Plaintiff Hojnowski claims that his right to adequate medical treatment as a

---

[17] Def. PrimeCare's Reply Ex. V [Doc. No. 74].  Dr. Paris's expert medical report is based on a review of all of Hojnowski's medical records from his pretrial incarceration at the Prison, which included several different sick call visits and treatments and spanned parts of both 2005 and 2006.  Only Hojnowski's March, 2005 infection is at issue here.

[18] Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[19] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[20] Celotex, 477 U.S. at 323-24.

[21] See Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002).

pretrial detainee was violated when he was required to wait until March 8, 2005 to be seen and treated for an infected cyst that opened and began to drain on March 6, 2005. In particular, he claims that Defendant Karrer violated his rights when she failed to ensure that he was promptly seen by Prison medical providers after she became aware of his open boil on March 6, 2005, and that Defendant PrimeCare violated his rights by failing to have in place a prescriptive policy for the diagnosis and rapid treatment of skin ailments at the relevant time, instead permitting medical providers to rely exclusively on their clinical judgment when confronted with such conditions. He brings these claims, based on the Due Process Clause of the Fourteenth Amendment of the United States Constitution, under 42 U.S.C. § 1983.

### A. Legal Standard

To succeed on a § 1983 claim, a plaintiff must show that the defendant, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States.[22] "The first step in evaluating a § 1983 claim is 'to identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"[23]

A pretrial detainee's claims of inadequate medical care while in prison are governed by the Due Process Clause of the Fourteenth Amendment.[24] The applicable inquiry is whether the detainee's treatment "amounted to punishment prior to an adjudication of guilt, or

---

[22] Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). Here, it is undisputed that at all relevant times Defendants were acting under color of state law .

[23] Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

[24] City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983); Hubbard v. Taylor, 399 F.3d 150, 165-66 (3d Cir. 2005); Kost v. Kozakiewicz, 1 F.3d 176, 188 n.10 (3d Cir. 1993).

whether [the] treatment was, instead, merely an incident of some other legitimate governmental purpose."[25]  The analysis considers the totality of the circumstances in the detention setting.[26] Treatment or a policy is a mere incident of a legitimate government purpose if it is rationally related to a purpose with a legitimate end.[27]   In contrast, treatment or a medical policy may qualify as punishment if it causes detainees "to endure such genuine privations and hardship over an extended period of time, that the conditions become excessive in relation to the purposes assigned to them."[28]  Mere negligence or inadvertence in failing to provide adequate medical care, such as might support a malpractice claim, does not satisfy this standard.[29]  Further, district courts must recognize that "the effective management of the detention facility . . . is a valid objective," with elements that are "peculiarly within the province and professional expertise of corrections officials,"[30] including prison medical providers.  Unless the evidence demonstrates that such officials have met the unique demands of prison management with an "exaggerated" response, "courts should ordinarily defer to their expert judgment in such matters."[31]

The Third Circuit has established that the Eighth Amendment standard governing

---

[25] Morgan-Mapp v. George W. Hill Corr. Facility, Civ. No. 07-2949, 2008 WL 4211699, at *13 (E.D. Pa. Sept. 12, 2008) (citing Hubbard, 399 F.3d at 158-59).

[26] Hubbard, 399 F.3d at 160.

[27] Id. at 159; Union County Jail Inmates v. DiBuono, 713 F.2d 984, 992 (3d Cir. 1983) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).

[28] Bell, 441 U.S. at 539.

[29] See Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987); see also, Morgan-Mapp, 2008 WL 4211699, at *13; Hussman v. Knauer, Civ. No. 04-2776, 2005 WL 435231, at *3 (E.D. Pa. Feb. 23, 2005).

[30] Bell, 441 U.S. at 540, 540 n.23.

[31] Id. at 540 n.23.

the medical treatment of convicted prisoners found in Estelle v. Gamble[32] constitutes a "floor" below which the medical treatment of pretrial detainees may not fall.[33]  In Estelle, the United States Supreme Court held that the Eighth Amendment bars prison authorities from acting with "deliberate indifference to the serious medical needs of prisoners."[34]  In the Third Circuit, a plaintiff meets the Estelle standard by demonstrating that a prison official was deliberately indifferent to his medical need, and that his need was serious.[35]

Because the Estelle standard represents a baseline for the quality of medical treatment pretrial detainees are entitled to receive, a pretrial detainee makes a sufficient, but not a necessary, showing on his medical treatment claim under the Fourteenth Amendment by establishing an Estelle claim.  However, a pretrial detainee's medical treatment claim against an individual may also be supported by something below the showing required to sustain a convicted prisoner's Eighth Amendment claim.  In particular, where an Eighth Amendment claim requires a showing that a defendant had actual knowledge of a plaintiff's medical need,[36] the standard applicable to pretrial detainees is "similar to recklessness – [p]laintiff must illustrate

---

[32] 429 U.S. 97 (1976).

[33] Hubbard, 399 F.3d at 165-66 (citing City of Revere, 463 U.S. at 244 ("the due process rights of a [pretrial detainee] are *at least* as great as the Eighth Amendment protections available to a convicted prisoner") (emphasis in original)).

[34] Estelle, 429 U.S. at 104.

[35] Lanzaro, 834 F.2d at 346.

[36] Farmer v. Brennan, 511 U.S. 825, 837 (1994); Wood v. City of Lancaster, Civ. No. 06-3033, 2009 WL 80306, at *15-*16 (E.D. Pa. Jan. 13, 2009); Morgan-Mapp, 2008 WL 4211699, at *13.

that the [individual defendants] knew or should have known of her serious medical need,"[37] and that they acted with reckless indifference to that need.[38] With respect to pretrial detainee claims based on the alleged absence or inadequacy of prison medical policies resulting in a delay in needed treatment, a plaintiff must show that the alleged policy shortcoming "creates a risk" of inadequate medical treatment "that is sufficiently obvious as to constitute" reckless indifference to his serious medical need.[39] The foregoing standards are applied to Defendants Karrer and PrimeCare in turn, below.

### B. Defendant Karrer

Hojnowski claims that Defendant Karrer violated his Fourteenth Amendment right to adequate medical treatment by denying him immediate care for his draining cyst on March 6, 2005, and instead referring him to the Prison sick call process. Hojnowski claims that this decision by Karrer caused him to suffer pain and itching from his cyst from March 6, 2005 until he was seen and treated by PrimeCare medical staff on March 8, 2005. It is undisputed that in making the contested decision regarding Hojnowski's condition, Karrer exercised discretion that PrimeCare vested in her as a Prison medical provider pursuant to, at a minimum, an informal policy for the treatment of skin ailments. Thus, Hojnowski's claim against Karrer must be that in

---

[37] Morgan-Mapp, 2008 WL 4211699, at *13 (citing Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024-25 (3d Cir. 1991) (applying "knew or should have known" standard to case of pretrial detainee suicide and explaining that the standard "connotes something more than a negligent failure to appreciate the risk . . . presented by the particular detainee, though something less than subjective appreciation of that risk" ); see also Wood, 2009 WL 80306, at *15 (same).

[38] See Wood, 2009 WL 80306, at *15-*16 (holding that prison personnel must act with "reckless indifference" to a pretrial detainee's serious medical need of which they knew or should have known for liability to attach, and rejecting a "conscious disregard" *scienter* requirement as inapposite to circumstances in which a defendant "should have," but did not, know of the medical need in question).

[39] Natale v. Camden County Corr. Facility, 318 F.3d 575, 585 (3d. Cir. 2003).

exercising her clinical judgment about the severity of his symptoms and the need for immediate treatment on March 6, 2005, Karrer acted with reckless indifference to a serious medical need.

Hojnowski characterizes this need as a staph infection, but no record evidence supports the assertion. The Court is unwilling to infer such a medical diagnosis from the circumstantial evidence presented by Plaintiff – namely, that nurses perceived a general rise in the number of skin and staph infections in the Prison in early 2005, and that later in 2005 Hojnowski was diagnosed with staph and MRSA infections. These proofs are simply insufficient to establish the nature of Hojnowski's infection in March of 2005. Rather, the Court need not rule on the question of the seriousness of Hojnowski's medical condition due to his failure to adduce evidence of Karrer's reckless indifference to his condition.

Hojnowski has failed to demonstrate that a genuine issue of material fact exists as to whether Karrer's response to his apparent skin infection rose to the level of reckless indifference. The evidence reflects that when shown the draining cyst on his leg, Karrer asked Hojnowski whether he had reported the condition to Prison medical staff through the sick call procedure. Hojnowski told her that he had already done so.[40] Karrer determined, and told Hojnowski, that he would have to wait to be seen through the sick call process. Impliedly, he would not be treated immediately for his apparent infected cyst. Karrer took no further action on Hojnowski's behalf with respect to his cyst. Plaintiff has adduced no evidence that this clinical determination and conduct on the part of Karrer was medically flawed, let alone reckless.[41] In

---

[40] In actuality, Hojnowski was incorrect: he had not reported on the submitted sick call slip that the cyst had opened and started to drain, only that he had a cyst, or "lump" on his leg.

[41] Hojnowski has, however, set forth evidence of issues related to Karrer's treatment of other inmates at other times which is not helpful to the Court's evaluation of Karrer's clinical determination with respect to Hojnowski's cyst on March 6, 2005.

contrast, Defendants have set forth an expert medical opinion embracing all of the treatment Hojnowski received while at the Prison, including treatment for his infected cyst in March, 2005. This uncontested expert opinion states that the treatment Hojnowski received met contemporary standards for prison medical care. Evaluating all the evidence related to Hojnowski's claims against Karrer, the Court finds no genuine fact issue regarding whether she acted with reckless indifference to Hojnowski's allegedly serious medical need. Indeed, the evidence adduced suggests that Karrer acted in accordance with the accepted standard of prison medical care for the relevant time period. Hojnowski's claims as to Karrer will be dismissed.

### C. Defendant PrimeCare

Hojnowski claims that PrimeCare policies, as applied, violated his right to adequate treatment for serious medical needs. In particular, Hojnowski claims PrimeCare medical policies in the Prison in March of 2005 were constitutionally deficient because they lacked a prescriptive policy for the diagnosis and rapid treatment of skin infections, especially MRSA, and permitted Prison medical providers to rely exclusively on their clinical judgment when encountering such ailments. Plaintiff attempts to maintain the argument that the medical policies in place at the Prison created a risk of inadequate medical treatment so obvious as to constitute reckless indifference to his serious medical need without the support of an expert witness on prison medical practices.[42] Defendants respond with the uncontested testimony of an expert in prison healthcare systems that Hojnowski's treatment satisfied contemporary standards

---

[42] Plaintiff endeavors to fill this evidentiary gap with reports and newsletters related to prison healthcare from the relevant time period which show that, as a general matter, MRSA was a growing concern and focus in the correctional health field, causing some institutions to develop and implement policies for the identification and treatment of MRSA, and in particular, its "community acquired" form, MRSA-CA. The general nature and focus of these documents sheds little light on the policies appropriate for the Prison in March of 2005, a question which only Defendants' correctional health expert has directly addressed.

in correctional health provision. In forming his opinion, Defendants' expert reviewed and considered the PrimeCare policies Hojnowski assails as constitutionally inadequate. These policies are not self-evidently deficient. Plaintiff's arguments, unsupported by evidence from the Prison or by a competing expert evaluation of the relevant PrimeCare policies, fail to persuade the Court that a genuine issue of material fact exists on this point. Plaintiff's claims against PrimeCare will be dismissed.

## V.  CONCLUSION

For the foregoing reasons, summary judgment will be granted as to both Defendants on all claims, and this action dismissed. An appropriate Order follows.